UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                    :
MARY L. HARRIS,                                     :
                                                    :
                        Plaintiff,                  :
                                                    :               20 Civ. 2011 (JPC)
            -v-                                     :
                                                    :                 OPINION
NYC HUMAN RESOURCES ADMINISTRATION *et al.* :                       AND ORDER
                                                    :
                        Defendants.                 :
                                                    :
------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Mary L. Harris, proceeding *pro se*, is a woman in her seventies who has worked at the New

York City Human Resources Administration ("HRA") for more than 35 years.  She brought this

action against the City of New York, the HRA, and Steven Banks, the Commissioner of the HRA,

alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination

in Employment Act of 1967 ("ADEA"), the Americans with Disabilities Act of 1990 ("ADA"), the

New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law

("NYCHRL"), and the New York Labor Law ("NYLL").  Before the Court is Defendants' motion

to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  For the reasons stated below, the Court grants this motion, but grants Harris leave to

file a third amended complaint.

## I.  Background

### A.  Factual Background

      The Court takes the following factual allegations from the Second Amended Complaint,

Dkt. 12, and the Statement of Facts in Support of the Second Amended Complaint, Dkt. 12-1

("Second Amended Complaint" or "SAC").  For purposes of this motion, the Court "accept[s] as true the factual allegations in the complaint and draw[s] all inferences in the plaintiff's favor." *Biro v. Condé Nast*, 807 F.3d 541, 544 (2d Cir. 2015).

Harris began working at the HRA in 1984 as a case worker.  SAC ¶ 3.  In this position, she helped people obtain public assistance, arrange utility services, and solve various other problems. *Id.*  In June 2004, she was promoted to the position of Supervisor III at a division of the HRA called the "Bronx CASA."[1]  *Id.* ¶ 4.  As a Supervisor III, she managed lower-level supervisors and oversaw certain units and services.  *Id.*  In September 2008, she began working at the Brooklyn CASA.  *Id.* ¶ 6.  Her experience at both CASA locations was "positive" for many years.  *Id.* ¶ 5.

In May 2014, Joyce Robinson-Steele became Harris's supervisor.  *Id.* ¶ 7.  Their relationship initially was "cordial and professional."  *Id.*  In 2016, Robinson-Steele gave Harris an "excellence card," something that managers at CASA use to recognize good work.  *Id.*  Although problems soon began, Harris received three excellence cards from 2017 to 2018 as well.  *Id.* ¶ 19.

The trouble started in 2016.  Robinson-Steele asked Harris to join an "audit team" because Harris had never violated any HRA rules or regulations.  *Id.* ¶ 9.  At several audit team meetings, Harris "raised the issue that certain employees were violating the code of conduct by running a private, unauthorized business selling food and drink and other items" at work.  *Id.*  The audit team did nothing about this, so in late 2016 Harris raised this issue to her supervisors and the HRA Inspector General.  *Id.* ¶ 10.  She explained that some employees were selling food and cosmetics at CASA during work hours.  *Id.*  When still nothing happened, Harris filed another complaint about these supposed violations with the Inspector General in late 2017.  *Id.*  Eventually in 2018,

---

[1] According to Defendants, "CASA" refers to the HRA's Home Care Services Program Medical Insurance and Community Services Administration Home Care Services Program.  *See* Dkt. 20 at 2 n.2.

"executive management" determined that these activities constituted violations of the rules and shut them down.  *Id.* ¶ 13.

One of the supposed rule violators ran "a food business from his desk."  *Id.* ¶ 12.  When Harris confronted him about it, he became "openly hostile."  *Id.*  Robinson-Steele "never addressed his violations."  *Id.*  In response to Harris's complaints, Robinson-Steele said, "he gives me food, [and] I don't have to pay for it."  *Id.* (internal quotation marks omitted).  Harris says that this implied Robinson-Steele was "willing to look the other way" so as to not disrupt the underground sundry sales.  *Id.*

Shortly after Harris raised these complaints, Robinson-Steele "began to criticize [Harris's] performance without justification."  *Id.* ¶ 14.  Specifically, she accused Harris of sleeping at work, consuming alcohol at work, and general insubordination.  *Id.*  Moreover, after Harris took a day off because of a doctor's appointment, Robinson-Steele "falsely accused [her] of lying about the need for a medical absence and altering the medical absence letter."  *Id.*  Robinson-Steele began to "constantly" write up Harris for "non-existent or petty infractions" of the rules.  *Id.*

At another point in 2017, Robinson-Steele accused Harris of not wearing a bra to work.  *Id.* ¶ 16.  Harris says this was not true and, apparently in an effort to prove this, she offered to accompany Robinson-Steele to the restroom, but Robinson-Steele declined the invitation.  *Id.* Harris reported this incident to the Equal Employment Opportunity Commission ("EEOC") in May 2017.  *Id.* ¶ 17.  The EEOC issued a right to sue letter, but Harris declined to pursue her grievance further.  *Id.*  Harris's EEOC complaint "apparently enraged" Robinson-Steele.  *Id.* ¶ 18.  Soon after she caught wind of it, Robinson-Steele accused Harris of neglecting her duties and showing up to work late.  *Id.*  She also shifted some responsibilities away from Harris and reassigned some of Harris's subordinates to other supervisors in an attempt to "isolate" Harris.  *Id.*  Robinson-Steele

shared her criticisms of Harris with others as well in an effort to "humiliate and embarrass" Harris. *Id.*

In 2017, Harris was the subject of a disciplinary hearing for what she characterizes as "trumped-up charges." *Id.* ¶ 20. The Second Amended Complaint does not explain what the charges were. In any event, the administrative law judge that presided over the hearing dismissed some of the charges and recommended, evidently as punishment for others, that Harris be demoted by one level. *Id.* The HRA subsequently demoted Harris by two levels. *Id.* In June 2019, Harris was transferred to the Brownsville CASA in Brooklyn. *Id.* ¶ 21. Harris alleges that she was "singled out for this hostile treatment" because she reported rule violations and filed a complaint with the EEOC, and even though others were "guilty of more serious violations of policies and rules," they were not subjected to disciplinary charges. *Id.* ¶ 22; *see also id.* ¶ 24 ("[Robinson-Steele] was also much more lenient with younger workers who were regularly violating the code of conduct, issuing them no warnings when I was being issued warnings for non-existent and insignificant infractions.").

During this time, Robinson-Steele "pester[ed]" Harris about retiring. *Id.* ¶ 23. Harris says that her employer tried to "force" her to retire by "overwhelming [her] with an oppressive workload." *Id.* ¶ 24. At the same time, she was assigned many "administrative-type responsibilities" that were too "rote or routine" for someone with her experience while "[y]ounger workers" received "more challenging and impactful assignments." *Id.* Robinson-Steele told Harris on "many occasions" that the HRA was "too top-heavy with Supervisors," which Harris says further "impl[ied] that [she] should retire." *Id.* ¶ 25. Even so, in 2018, the HRA hired a new supervisor who was younger than Harris. *Id.*

In 2018, Robinson-Steele positioned Harris's workspace in an area of the office that was

not adequately air-conditioned during the summer and had "oppressive" heat.  *Id.* ¶ 26.  Harris contends that this too was "an effort to force [her] out."  *Id.*  Harris requested her workspace be moved to a new area and provided her employer with a medical letter that stated she suffered from "heat exhaustion."  *Id.*  The HRA's Labor Relations office directed Robinson-Steele to move Harris to a more ventilated area.  *Id.*  Robinson-Steele was "quite unhappy" with this and that same day issued Harris three "baseless warnings."  *Id.*

Harris also has a "chronic and painful arthritic condition" in her knees that developed "[s]everal years ago."  *Id.* ¶ 28.  She uses a cane, and her doctor told her that she should "stay off [her] feet whenever possible."  *Id.*  Harris's commute from her home in the Bronx to CASA in Brooklyn caused her knee pain.  *Id.* ¶ 29.  Harris told HRA managers about her condition, but never requested an accommodation for this.  *Id.*  However, she says that because CASA has many locations, her employer "could have provided an accommodation by relocating [her] closer to [her] home."  *Id.*

Besides Robinson-Steele, Harris also had problems with other CASA employees.  At some point in 2017 or 2018, one coworker used offensive language and called Harris "a man with two balls."  *Id.* ¶ 15 (internal quotation marks omitted).  Another "constantly us[ed] the F-word and other offensive language" in an effort to "deliberately annoy" Harris.  *Id.*  Further, Harris's desk was vandalized, and "intimidating notes" were left on it.  *Id.*  She reported these incidents to her supervisors, but they took no action.  *Id.*  Robinson-Steele specifically told Harris "not to bother her with this garbage."  *Id.* (internal quotation marks omitted).

On July 26, 2019, Harris filed an EEOC complaint in which she alleged she had been subjected to discrimination and retaliation.  *Id.* ¶ 30.  The EEOC issued a right to sue letter on December 6, 2019.  *Id.*

**B.  Procedural History**

Harris initiated this suit on March 5, 2020 with the filing of a complaint.  Dkt. 2.  On April 30, 2020, she filed an amended complaint, Dkt. 7, and on July 27, 2020, she filed the Second Amended Complaint.  Dkt. 12.  Harris alleges that the City of New York, the HRA, and Banks violated Title VII, the ADEA, the ADA, the NYSHRL, the NYCHRL, and the NYLL.  SAC ¶ 1. She requests damages for "emotional distress, pain and suffering, [and] humiliation," as well as back pay to compensate her for her demotion.  SAC at 6.  Harris also seeks injunctive relief.  *See id.*  She asks the Court to enjoin the HRA and its employees from further retaliating against her, to direct the HRA to promote her back to the role of Supervisor III, and to require the HRA and its employees to provide her a reasonable accommodation for her disability.  *Id.*

This case was initially assigned to the Honorable Vernon S. Broderick and was reassigned to the undersigned on September 29, 2020.  On September 30, 2020, Defendants filed a motion to dismiss, Dkt. 19, and a memorandum of law in support of their motion, Dkt. 20 ("Motion").  Harris filed an opposition brief on November 27, 2020.  Dkt. 29 ("Opposition").  Defendants filed a reply on December 7, 2020.  Dkt. 31 ("Reply").

## II.  Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Although the Court must "accept[] as true the factual allegations in the

complaint and draw[] all inferences in the plaintiff's favor," *Biro*, 807 F.3d at 544, it need not

"accept as true legal conclusions couched as factual allegations," *Lafaro v. N.Y. Cardiothoracic*

*Grp., PLLC*, 570 F.3d 471, 475-76 (2d Cir. 2009).

The Court must construe *pro se* submissions "liberally" and interpret them "to raise the

strongest arguments that they suggest." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 243 (2d

Cir. 2020) (per curiam) (internal quotation marks omitted).  But a *pro se* complaint still "must state

a plausible claim for relief." *Id.*  "Even in a *pro se* case . . . threadbare recitals of the elements of

a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*,

618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks omitted).[2]

### III.  Discussion

#### A.  Timeliness

"Before a plaintiff may assert claims under Title VII or the ADEA in federal court, she must

present the claims forming the basis of such a suit in a complaint to the EEOC." *Zoulas v. New*

*York City Dep't of Educ.*, 400 F. Supp. 3d 25, 49 (S.D.N.Y. 2019) (citing *Littlejohn v. City of New*

*York*, 795 F.3d 297, 322 (2d Cir. 2015) (Title VII); *McPherson v. New York City Dep't of Educ.*,

---

[2] In their Reply, Defendants claim that Harris's Opposition "was drafted with the assistance of an attorney from the New York Legal Assistance Group ('NYLAG')."  Reply at 1 n.1.  Courts have noted that "it is not appropriate to afford *pro se* litigants special solicitude where a licensed attorney assisted in drafting their briefs, motions or other court documents."  *Askins v. Metro. Transit Auth.*, No. 19 Civ. 4927 (GHW), 2020 WL 1082423, at *3 (S.D.N.Y. Mar. 5, 2020).  The Court notes that Harris's Opposition contains extensive legal citations to relevant caselaw and statutes, generally in proper Bluebook format.  Yet, the brief is signed only by Harris as "PLAINTIFF *PRO SE*."  Opposition at 12.  It is therefore unclear whether NYLAG assisted in drafting the Opposition.  The Court thus assumes Harris drafted the Opposition, as well as the Second Amended Complaint, and construes them under the applicable standards for *pro se* litigants.  *See Meadows*, 963 F.3d at 243.  However, if Harris chooses to file a third amended complaint, any document prepared with the assistance of NYLAG (including the third amended complaint and any future briefs) should clearly disclose this.  *See, e.g.*, *Askins*, 2020 WL 1082423, at *4 (explaining that the second amended complaint and opposition brief indicated that those documents were "prepared with the assistance of the New York Legal Assistance Group's Clinic for Pro Se Litigants in the S.D.N.Y.").

457 F.3d 211, 213 (2d Cir. 2006) (ADEA)). The same is true of employment discrimination claims pursuant to the ADA. *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 258 (S.D.N.Y. 2015). A claim under each of these three statutes is time-barred if the plaintiff does not file a charge with the EEOC within 300 days of the alleged unlawful employment practice. *Duplan v. City of New York*, 888 F.3d 612, 621 (2d Cir. 2018) (Title VII); *Paneccasio v. Unisource Worldwide, Inc.*, 532 F.3d 101, 112 (2d Cir. 2008) (ADEA); *Tewksbury v. Ottaway Newspapers*, 192 F.3d 322, 325 (2d Cir. 1999) (ADA); *see also* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1). "Where the plaintiff complains of discrete discriminatory or retaliatory acts such as 'termination, failure to promote, denial of transfer, or refusal to hire,' such claims are not actionable if they occurred prior to the 300-day period even though they may be related to acts that occurred within the permissible 300-day period." *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 42 (2d Cir. 2019) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).[3]

Harris filed her complaint alleging discrimination and retaliation with the EEOC on July 26, 2019. SAC ¶ 30. Thus, any discrete discriminatory or retaliatory actions that occurred before September 28, 2018 are time barred.[4] The majority of the allegedly discriminatory or retaliatory conduct that Harris alleges occurred prior to September 28, 2018. *See id.* ¶¶ 14-20. Only two incidents fall within the 300-day limitations period: (1) Harris's demotion in October 2018 after the

---

[3] A 180-day limitations period typically applies under these statutes, but this is extended to 300 days if the plaintiff "initially instituted proceedings with a State or local agency." 42 U.S.C. § 2000e-5(e)(1); *see Duplan*, 888 F.3d at 621 n.7 (explaining that the 300-day limitations period applies when a plaintiff "complain[s] about conduct that occurred in a state with its own antidiscrimination enforcement mechanisms, which includes New York"). Here, it is not clear that Harris commenced proceedings with an agency besides the EEOC, but Defendants assume the 300-day period applies. *See* Motion at 4. The Court thus applies the longer period too.

[4] Three-hundred days before July 26, 2019 is September 29, 2018, which was a Saturday. Defendants say conduct occurring prior to September 28, 2018, the Friday before this date, is time-barred. *See* Motion at 4. No conduct is alleged to have occurred on September 28, 2018, so this possible discrepancy does not matter.

conclusion of the disciplinary hearing, *id.* ¶ 20,[5] and (2) Harris's transfer in June 2019 to another CASA location, *id.* ¶ 21.

Harris points to the continuing violation doctrine and argues that "the entire series of discriminatory and retaliatory actions should be considered." Opposition at 6. "The continuing violation doctrine provides that '[w]hen a plaintiff experiences a continuous practice and policy [that violates his or her rights], . . . the commencement of the statute of limitations period may be delayed until the last [violation].'" *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018) (alterations in original) (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)). "To qualify as continuing, the claimed actions must not be discrete acts, but repeated conduct that occurs over a series of days or perhaps years." *Zoulas*, 400 F. Supp. 3d at 49 (internal quotation marks omitted); *accord Morgan*, 536 U.S. at 114-15.

As noted, the only two incidents that fall within the 300-day period are Harris's demotion and transfer. Each of these is a "discrete act[]," *Morgan*, 536 U.S. at 114, and thus the continuing violation doctrine does not apply. *See Zoulas*, 400 F. Supp. 3d at 50 ("Examples of discrete acts, for the purposes of the continuing violation doctrine, include disparate disciplining, negative performance reviews, termination, failure to promote, and denial of a preferred job position."). The Court therefore will not consider any acts that occurred prior to September 28, 2018 for purposes of Harris's discrimination or retaliation claims.

However, "[h]ostile environment claims are different in kind from discrete acts" because "[t]heir very nature involves repeated conduct." *Morgan*, 536 U.S. at 115. "While discrete claims of discrimination and retaliation must be brought within the 300-day limitations period to be

---

[5] Although the Complaint does not allege the precise date of this event, *see* SAC ¶ 20, Harris says in her Opposition that it occurred in October 2018, Opposition at 5, and Defendants concede that Harris's demotion occurred within the 300-day period, Motion at 8.

actionable, a different rule applies with regard to hostile work environment claims." *Zoulas*, 400 F. Supp. 3d at 50 (quoting *Spence v. Bukofzer*, No. 15 Civ. 6167 (ER), 2017 WL 1194478, at *5 (S.D.N.Y. Mar. 30, 2017)).   In *Morgan*, the Supreme Court made clear that "the incidents constituting a hostile work environment are part of one unlawful employment practice," and thus the claim is timely so long as the plaintiff timely filed with the EEOC a complaint pertaining to any act that is part of the hostile work environment claim.   536 U.S. at 118.   Because Harris's EEOC complaint was filed within the 300-day period for at least some of the acts in question, she is not barred from arguing that actions that occurred prior to September 28, 2018 contributed to her hostile work environment claims.   *See Zoulas*, 400 F. Supp. 3d at 51.

In sum, the Court will not consider acts that occurred before September 28, 2018 for Harris's discrimination and retaliation claims.   But for Harris's hostile work environment claims, it will.

**B.  Sex, Age, and Disability Discrimination Under Title VII, the ADEA, and the ADA**

As a preliminary matter, Title VII prohibits an employer from discriminating on the basis of an individual's "race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   Harris alleges that Defendants violated Title VII, but does not make clear the basis on which she alleges discrimination.   She mentions nothing about her race (except for once noting that she is African American, SAC ¶ 2), color, religion, or national origin.   The Court therefore assumes her Title VII claim is one of sex-based discrimination because Harris discusses several incidents that involved sexual topics.   *See id.* ¶¶ 15 (discussing one employee calling her a "man with two balls" (internal quotation marks omitted)), 16 (describing an incident in which Robinson-Steele accused Harris of not wearing a bra).   The Court thus reads Harris's Second Amended Complaint as alleging discrimination on the basis of sex pursuant to Title VII, age pursuant to the ADEA, and disability pursuant to the ADA.

Each of these claims is evaluated under the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Menaker v. Hofstra Univ.*, 935 F.3d 20, 30 (2d Cir. 2019) (Title VII); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106-07 (2d Cir. 2010) (ADEA); *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (ADA). To ultimately succeed under this framework, "a plaintiff must first demonstrate a *prima facie* case of employment discrimination by showing that: '(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.'" *Farmer v. Shake Shack Enters., LLC*, 473 F. Supp. 3d 309, 324 (S.D.N.Y. 2020) (quoting *Menaker*, 935 F.3d at 30). "[O]nce a plaintiff produces minimal evidentiary support for the claim of discriminatory motivation, the burden of production shifts to the employer to articulate a non-discriminatory reason for the adverse employment action." *Davis v. New York City Dep't of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015). "But once the employer has set forth its non-discriminatory justification, the plaintiff must then produce evidence capable of carrying the burden of persuasion that the employer's action was at least in part motivated by discrimination." *Id.*

To defeat a motion to dismiss, however, a plaintiff "is not required to plead a *prima facie* case under *McDonnell Douglas*." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015). Rather, a plaintiff must "alleg[e] facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination." *Id.* at 87. At the motion to dismiss stage, "the question is not whether a plaintiff is *likely* to prevail, but whether the well-pleaded factual allegations *plausibly* give rise to an inference of unlawful discrimination, *i.e.*, whether plaintiffs allege enough to 'nudge[] their claims across the line from conceivable to plausible.'" *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 570).

### 1. Sex Discrimination Under Title VII

To defeat a motion to dismiss, a Title VII plaintiff must allege facts that "give plausible support to the reduced requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation." *Littlejohn*, 795 F.3d at 311. Thus "[f]or employment discrimination claims under Title VII . . . a plaintiff must 'plausibly allege that (1) the employer took adverse action against [the plaintiff] and (2) [the plaintiff's] race, color, religion, sex, or national origin was a motivating factor in the employment decision.'" *Farmer*, 473 F. Supp. 3d at 324 (quoting *Vega*, 801 F.3d at 87).

The Court rejects Harris's Title VII claim because the Second Amended Complaint does not plead any facts suggesting that her demotion or transfer was linked to her sex. *See* SAC ¶¶ 20-21. Nor does she even mention her sex in her Opposition. The Court thus dismisses Harris's claim for sex discrimination pursuant to Title VII.

### 2. Age Discrimination Under ADEA

"The ADEA makes it unlawful for an employer 'to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Zoulas*, 400 F. Supp. 3d at 51 (quoting 29 U.S.C. § 623(a)(1)). "To survive a motion to dismiss an age discrimination claim brought under the ADEA . . . a plaintiff must plausibly allege that she 'is a member of a protected class, was qualified, suffered an adverse employment action, and has at least minimal support for the proposition that the employer was motivated by discriminatory intent.'" *Id.* (quoting *Luka v. Bard Coll.*, 263 F. Supp. 3d 478, 484-85 (S.D.N.Y. 2017)). Thus, the Second Amended Complaint must plead facts that "give plausible support to a minimal inference of discriminatory motivation." *Littlejohn*, 795 F.3d at 311.

With regard to Harris's demotion, the Second Amended Complaint alleges that even though the recommendation from the administrative law judge presiding over Harris's disciplinary hearing was to demote her one level, Defendants chose to demote her two levels because of Defendants' "continuing pattern of harassing [Harris] in the hopes [she] will retire." SAC ¶ 20. Besides this conclusory assertion, Harris offers no facts to suggest that her demotion had anything to do with her age rather than punishment for the conduct at issue in her disciplinary hearing. Similarly, the Second Amended Complaint offers absolutely no context about her June 2019 transfer to another CASA location. Instead, it only says that Harris "was transferred" during this time. *Id.* ¶ 21. Thus, Harris fails to plead facts that plausibly support a "minimal inference of discriminatory motivation," *Littlejohn*, 795 F.3d at 311, and the Court dismisses her age discrimination claim pursuant to the ADEA.

### 3. Disability Discrimination Under the ADA

"To establish a prima facie case of discrimination under the ADA, a plaintiff must show: (1) [her] employer is subject to the ADA; (2) [she] is disabled within the meaning of the ADA; (3) [she] is otherwise qualified to perform the essential functions of [her] job; and (4) [she] suffered an adverse employment action because of [her] disability." *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 145 (E.D.N.Y. 2018); *accord Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004). At the motion to dismiss stage, "the Plaintiff needs only allege a set of facts that . . . makes it plausible that the Plaintiff's disability was a motivating factor in the adverse employment action." *Laface*, 349 F. Supp. 3d at 145 (internal quotation marks omitted).

Assuming that Harris has a disability within the meaning of the ADA, the Second Amended Complaint alleges no facts that it played any role in Defendants' decisions to demote or transfer her. *See* Comp. ¶¶ 20-21. The Court thus dismisses Harris's disability discrimination claim

pursuant to the ADA.

## C.  Retaliation Under Title VII

In May 2017, Harris filed a complaint with the EEOC, *id.* ¶ 17, after Robinson-Steele "accused [Harris] of not wearing a bra to work," *id.* ¶ 16.  Harris says that this complaint "apparently enraged" Robinson-Steel, who then subjected Harris to "continuing harassment."  *Id.* ¶ 18.

Because Harris's May 2017 EEOC complaint involved sexual comments, the Court construes Harris's retaliation claim under Title VII rather than the ADEA or ADA.  To demonstrate a *prima facie* case of retaliation under Title VII, "a plaintiff must establish: '(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action.'" *Farmer*, 473 F. Supp. 3d at 330 (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010)).  "As with discrimination claims, at the motion to dismiss stage, 'the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas* in the initial phase of a Title VII litigation."  *Id.* at 331 (quoting *Duplan*, 888 F.3d at 625).  Thus, "[f]or a retaliation claim to survive a motion to dismiss, 'the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action— against [her], (2) because [she] has opposed any unlawful employment practice.'"  *Id.* (quoting *Vega*, 801 F.3d at 90).

As discussed above, the only "materially adverse employment action[s]," *Farmer*, 473 F. Supp. 3d at 330 (quoting *Kaytor*, 609 F.3d at 552), that are not time barred are Harris's demotion and transfer.  The problem for Harris is that the Second Amended Complaint fails plausibly to plead that there was any causal connection between Harris's May 2017 EEOC complaint and her

14

demotion in October 2018 or her transfer in June 2019.  Although there is no bright-line rule, "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation."  *Murray v. Visiting Nurse Servs. of N.Y.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007); *accord Vale v. Great Neck Water Pollution Control Dist.*, 80 F. Supp. 3d 426, 441 (E.D.N.Y. 2015) (explaining that "courts in this Circuit have often found that a temporal gap of approximately three months between the protected activity and the adverse action, without more, prohibits an inference of causation" (quoting *Nadel v. Shinseki*, 57 F. Supp. 3d 288, 299 (S.D.N.Y. 2014)); *Williams v. City of New York*, No. 11 Civ. 9679 (CM), 2012 WL 3245448, at *11 (S.D.N.Y. Aug. 8, 2012) ("The passage of even two or three months is sufficient to negate any inference of causation when no other basis to infer retaliation is alleged.").  Here, Harris's demotion occurred seventeen months after she filed her EEOC complaint alleging sexual harassment and her transfer occurred more than two years later.

With such a lengthy passage of time, Harris cannot rely on temporal proximity alone to state a claim of retaliation.  In the absence of any further factual allegations suggesting a causal connection between Harris's EEOC complaint and her demotion or transfer, Harris has not plausibly alleged that her demotion or transfer occurred because she "opposed any unlawful employment practice."  *Vega*, 801 F.3d at 90.  The Court therefore dismisses Harris's Title VII retaliation claim.[6]

---

[6] Defendants seem to move to dismiss claims for retaliation under the ADEA and ADA too.  Motion at 11-12.  As mentioned, the Court does not construe Harris's Complaint to raise such claims.  To the extent it does, these claims fail because Harris does not allege that she was retaliated against because she participated in activity protected by either of these statutes.

**D. Hostile Work Environment Under Title VII and the ADEA**

Both Title VII and the ADEA prohibit "requiring people to work in a discriminatorily hostile or abusive environment." *Davis-Garett*, 921 F.3d at 41 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Hostile work environment claims pursuant to these statutes are evaluated under the same standard and are violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (alterations in original) (quoting *Harris*, 510 U.S. at 21 (Title VII)); *see also Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240 (2d Cir. 2007) (ADEA). To determine whether an environment is "hostile" or "abusive," the Court must consider "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

To state a claim for a hostile work environment based on gender in violation of Title VII, Harris "must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's sex." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks omitted); *accord Harris*, 510 U.S. at 21-22. "Similarly, under the ADEA, '[a] work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it' because of conduct based on the plaintiff's over-40 age.'" *Davis-Garett*, 921 F.3d at 41 (quoting *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999)). Importantly, the complained of

hostility must be "because of [the plaintiff's] membership in a protected class." *Brennan*, 192 F.3d at 318.  "In other words, an environment which is equally harsh for both men and women or for both young and old does not constitute a hostile working environment under the civil rights statutes."  *Id.*

The Second Amended Complaint does not allege "severe or pervasive" conduct based on Harris's sex. *Davis-Garett*, 921 F.3d at 41.  Harris points to Robinson-Steele's accusation that she did not wear a bra to work one day in 2017, SAC ¶ 16, and another employee's use of offensive language, including calling her "a man with two balls," *id.* ¶ 15 (internal quotation marks omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not amount to violations of Title VII because such conduct does not cause "changes in the 'terms and conditions of employment.'" *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).  Such offhand comments and isolated incidents are precisely what Harris alleges here.  Courts around the country routinely have held that evidence of more frequent harassment was insufficient as a matter of law to "alter the terms and conditions of employment" such that it constituted a hostile work environment.  *See Alfano v. Costello*, 294 F.3d 365, 379 (2d Cir. 2002) (collecting cases).  The Court therefore dismisses Harris's hostile work environment claim under Title VII.

Nor does the Second Amended Complaint allege "severe or pervasive" conduct that created a hostile environment because of Harris's age. *Davis-Garett*, 921 F.3d at 41.  The Second Amended Complaint alleges that Robinson-Steele "pester[ed]" Harris about "when [she] planned to retire," SAC ¶ 23, and "told [Harris] on many occasions that the HRA was too top-heavy with Supervisors, implying that [she] should retire," *id.* ¶ 25.  Harris also alleges that Defendants subjected her to poor working conditions in an effort to force her to retire.  *Id.* ¶¶ 24, 26.  For example, Harris says

Defendants located her workspace in a poorly air-conditioned area of the office (but concedes that she was transferred to a "better ventilated area" once she asked to move). *Id.* ¶ 26. She also contends that Robinson-Steele gave her "baseless warnings," *id.*, and that Defendants "tried to force [her] to retire" by "overwhelming [her] with an oppressive workload" while simultaneously giving younger workers "more challenging and impactful assignments," *id.* ¶ 24. Even assuming that an inference of discrimination exists with regard to these allegations, they do not establish "the kind of severity and pervasiveness that can amount to an actionable hostile work environment claim." *Alexander v. New York City Dep't of Educ.*, No. 19 Civ. 7023 (AJN), 2020 WL 7027509, at *8 (S.D.N.Y. Nov. 30, 2020). Courts in this District have found similar allegations to fall far short of altering the conditions of employment and thus did not constitute a hostile work environment. *Antrobus v. New York City Health & Hosps. Corp.*, No. 19 Civ. 7449 (KPF), 2021 WL 964438, at *12 (S.D.N.Y. Mar. 15, 2021) (rejecting the plaintiff's argument that her hostile work environment claim was plausible because "younger colleagues were given choice assignments" (internal quotation marks omitted)); *Alexander*, 2020 WL 7027509, at *8 (rejecting the plaintiff's argument that "an excessive workload compared to other teachers" constituted a hostile work environment under the ADEA); *Trachtenberg v. Dep't of Educ. of City of New York*, 937 F. Supp. 2d 460, 472-73 (S.D.N.Y. 2013) (rejecting the plaintiff's argument that "excessive scrutiny" and a move to a "poorly ventilated, windowless office" plausibly pleaded a hostile work environment). Accordingly, the Court dismisses Harris's hostile work environment claim pursuant to the ADEA.[7]

---

[7] The Court does not understand Harris to raise a hostile work environment claim pursuant to the ADA. However, to the extent that she does, this too fails because the Second Amended Complaint fails to allege conduct showing that she was subjected to "severe or pervasive" harassment with regard to her alleged disability.

### E.  Failure to Accommodate Under the ADA

Harris further alleges that Defendants failed to accommodate her "chronic and painful arthritic condition in [her] knees," SAC ¶ 28, by requiring her to commute to Brooklyn rather than relocating her to a CASA location closer to her home in the Bronx, *id.* ¶ 29.  Although she never requested an accommodation, let alone a transfer to the Bronx CASA, Harris argues that "[her] supervisors certainly knew of [her] disability" and thus should have relocated her or, at the least, "engaged in a conversation with [her] on how they might accommodate" her disability.  *Id.*

The *prima facie* case for a failure to accommodate claim requires a plaintiff to demonstrate that:

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

*McMillan v. City of New York*, 711 F.3d 120, 125-26 (2d Cir. 2013) (quoting *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009)).  Further, "[p]laintiff must plead sufficient facts to raise the inference 'that the failure [to accommodate] was motivated by discriminatory intent.'"  *Novick v. Vill. of Wappingers Falls, N.Y.*, 376 F. Supp. 3d 318, 337 (S.D.N.Y. 2019) (quoting *Lyman v. City of New York*, No. 01 Civ. 3789 (RWS), 2003 WL 22171518, at *6 (S.D.N.Y. Sept. 19, 2003)).

"[G]enerally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006).  However, "if the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled," then the employer "has a duty reasonably to accommodate an employee's disability" even if the employee does not ask for an accommodation.  *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008).  When an employer is on notice

of such a disability, it must "engage in an interactive process" with the employee and "work together to assess whether [the] employee's disability can be reasonably accommodated." *Id.* (internal quotation marks omitted).

"Not every impairment is a 'disability' within the meaning of the ADA; rather there are two requirements: the impairment must limit a major life activity and the limitation must be substantial." *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005).  "A plaintiff is also disabled within the meaning of the ADA if [the plaintiff] is 'regarded' by his employer as having a physical or mental impairment that substantially limits a major life activity." *Id.* at 57.  Harris says only that she has a "chronic and painful arthritic condition in [her] knees" that makes it "painful to walk" and climb stairs.  SAC ¶ 28.  From these allegations, it is far from clear that Harris has alleged a disability under the ADA.  *See Woolf v. Bloomberg L.P.*, No. 16 Civ. 6953 (PKC), 2019 WL 1046656, at *10 ( S.D.N.Y. Mar. 5, 2019) ("[I]mpairments like . . . arthritis may or may not qualify as a disability under the ADA, depending on whether a plaintiff can demonstrate a substantial limitation on one or more major life activit[ies]."), *aff'd sub nom. Woolf v. Strada*, 949 F.3d 89 (2d Cir. 2020); *see also Covello v. Depository Tr. Co.*, 212 F. Supp. 2d 109, 120-21 (E.D.N.Y. 2002) (finding that degenerative arthritis did not constitute a disability under the ADA).

But even assuming Harris's condition is a disability under the ADA, she does not plausibly plead that Defendants knew that she had a disability such that it triggered Defendants' obligation to engage in an interactive process pursuant to *Brady*, 531 F.3d at 135.  Harris concedes that she never requested an accommodation.  SAC ¶ 29.  Instead, she only alleges that her employer was on notice of her disability because she "walk[s] with a cane" and "on numerous occasions informed HRA management that [she] was suffering physical pain." *Id.*  These allegations, without more, do not plausibly plead that Defendants knew Harris suffered from a disability that is covered by the

ADA but refused to do anything.  *See Costabile v. New York City Health & Hosps. Corp.*, 951 F.3d 77, 82 (2d Cir. 2020) (per curiam) (explaining that an employer's knowledge that the plaintiff was "on an extended disability leave from work-related injuries" did not plausibly allege that those injuries constituted a disability under the Rehabilitation Act of 1973); *see also Bragdon v. Abbott*, 524 U.S. 624, 631 (1998) ("The ADA's definition of disability is drawn almost verbatim from the definition of 'handicapped individual' included in the Rehabilitation Act of 1973.").  The Court thus grants Defendants' motion to dismiss Harris's failure to accommodate claim.

**F.  State Law Claims**

Harris also raises claims under the NYSHRL, the NYCHRL, and the NYLL.  *See* SAC ¶ 1. Pursuant to 28 U.S.C. § 1367(c)(3), the Court may "decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 103 (2d Cir. 1998).  In determining whether to exercise supplemental jurisdiction, courts consider "the values of judicial economy, convenience, fairness and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

Considering these factors, the Court declines to exercise supplemental jurisdiction over Harris's state and city law claims.  *See Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (explaining that in a typical case in which "a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well" (internal quotation marks omitted)).  The Court finds that "judicial economy, convenience, fairness and comity," *Cohill*, 484 U.S. at 350, weigh in favor of dismissing Harris's state law claims as well.

**G.  Leave to Amend**

Harris requests leave to amend if the Court dismisses the Second Amended Complaint. Opposition at 1.  "Generally, leave to amend should be freely given, and a *pro se* litigant in

particular should be afforded every reasonable opportunity to demonstrate that [the litigant] has a valid claim." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quoting *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000)).  "[A] *pro se* complaint should not [be] dismiss[ed] without [the Court's] granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (alterations in original) (internal quotation marks omitted).  In accordance with this case law, the Court will grant Harris leave to file a third amended complaint.

## IV.  Conclusion

For these reasons, Defendants' motion to dismiss the Second Amended Complaint is granted without prejudice to filing a third amended complaint.  The Clerk of Court is respectfully directed to terminate the motion pending at Docket Number 19.

If Harris chooses to file a third amended complaint, she must do so by September 27, 2021. Because any third amended complaint will completely replace, not supplement, the Second Amended Complaint, any facts or claims that Harris wishes to maintain must be included in the third amended complaint.  Thus, the Court grants Harris leave to replead any claims, including her state law claims, in the third amended complaint.  If Harris fails to file a third amended complaint by September 27, 2021 and she cannot show good cause to excuse such failure, the Court will direct the Clerk of Court to close this case.

The Clerk of Court is directed to mail a copy of this Opinion and Order to Harris.

SO ORDERED.

Dated: August 27, 2021
        New York, New York

_____
JOHN P. CRONAN
United States District Judge